HENRY B. GRUDBERG, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Grudberg v. Commissioner
Docket No. 6100-72.
United States Tax Court
T.C. Memo 1975-142; 1975 Tax Ct. Memo LEXIS 227; 34 T.C.M. (CCH) 669; T.C.M. (RIA) 750142; May 15, 1975, Filed *227 Henry B. Grudberg, pro se. L. William Fishman, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in petitioner's Federal income tax for the calendar year 1970 in the amount of $634.97. The only issue for decision is whether petitioner is entitled to a deduction of an ordinary loss of $15,000 for the taxable year 1970 because of receiving notice in that year that certain notes payable only on stated contingencies would not be paid because of failure of the stated contingencies to occur. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner who resided in the Bronx, New York, at the time of the filing of his petition in this case, filed his Federal income tax return for the calendar year 1970 with the North Atlantic Service Center, Andover, Massachusetts, as a married person filing separately. Petitioner was the organizer in March 1961 of a New Jersey corporation, New Jersey Helicopter Airways, Inc. (NJHA). Petitioner and his wife paid in initial capital of $20,000, of which petitioner's portion was $5,000. Stock was sold to other stockholders *228 with the total capital paid in for stock being $50,400, for which common stock was issued. Money was also raised through debenture notes of the corporation in the amount of $53,000. NJHA operated a charter helicopter flying service, made sales of helicopters, and did maintenance work on helicopters owned by corporations. It had contracts with the State of New Jersey, the Garden State Parkway, and the United Nations, and did crop spraying for farmers. Included in its business was teaching individuals to fly helicopters and some flying which was done in Argentina. In late 1964 or early 1965 NJHA had developed serious cash flow problems. It was being pressed for payment by the bank which had financed its purchase of helicopters and was not sufficiently capitalized to meet all of its current obligations promptly. Petitioner was the president of NJHA. The company had made some operating profit and petitioner was of the opinion that if he were able to obtain adequate financing for the company, it would operate successfully. NJHA had sold Ronson Corporation (Ronson) a helicopter and petitioner personally had taught the president of that corporation to fly. Since petitioner knew the *229 president of Ronson because of this previous association, he approached him concerning the financial problems of NJHA. When petitioner asked the president of Ronson for a loan, he was informed that the corporation would not be interested in making a loan to NJHA, but might be interested in acquiring all the corporate stock through one of its subsidiaries. Petitioner worked out an agreement with Ronson, under which Conhel Corporation (Conhel), a subsidiary of Ronson, would acquire all of the stock of NJHA and it would be petitioner's responsibility to obtain the agreement of the other stockholders for the sale of their stock to Conhel. The stock was to be purchased for a contingency note of Conhel given to each stockholder in an amount equal to the amount he had paid for his stock, and the $53,000 of debentures were to be purchased by Conhel from the holders for notes without any contingency as to their payment. The date of acquisition of all the stock by Conhel was to be September 1, 1965. On August 31, 1965, just prior to the acquisition, Ronson loaned to petitioner personally $110,000, of which he in turn loaned $102,970.44 to NJHA for payment of pressing financial obligations so *230 that it could solve its financial problems. The remaining $8,029.76 [1] was loaned to petitioner by Ronson for use in buying stock of the stockholders who had been unwilling to sell their stock to Conhel for a contingency note. NJHA was indebted to petitioner for the $102,970.44 which petitioner loaned to it from the money he had received from Ronson. Petitioner used the remaining $8,029.76 and some of his own funds to acquire stock of persons unwilling to sell their stock to Conhel for contingency notes. After these acquisitions petitioner owned stock of NJHA which had cost him $15,000. He owned 788 shares and his wife who had agreed to sell her stock for a contingency note owned 262 shares. The total outstanding common stock of NJHA as of August 31, 1965, was 1,851 shares. The owners of all the shares, petitioner having acquired shares of dissenting stockholders, agreed to the terms of the purchase of their common stock by Conhel. A letter of Conhel to petitioner dated June 24, 1965, set out the terms under which Conhel *231 would purchase the stock of NJHA. The letter stated that to accept the offer petitioner should sign and return the duplicate copy of the letter, evidencing his concurrence in the arrangement. The letter was agreed to by petitioner. Insofar as here pertinent, this letter stated: 2. You will accept as payment for your common stock of NJHAI four (4) equal promissory notes bearing interest at 5 per cent per annum and equivalent in amount to the total monies which you paid for your shares of stock of NJHAI. Interest on said promissory notes will be paid semi-annually by Conhel irrespective of the following limitations applicable to the payment of the principal amount of such notes. a. The first such note will be due and payable at the end of the second year following the date Conhel purchased your stock. This note will be paid in cash, or in common stock of Ronson Corporation, at your option, if the net profit before Federal income taxes of NJHAI for the period January 1, 1966 through December 31, 1966 is $50,000 or more. In addition, the three remaining notes payable to you will become due and payable on their maturity dates if said $50,000 profit is so made by NJHAI. b. The second *232 note will be due and payable at the end of the third year following the date Conhel purchased your stock. This note will be paid in cash, or in common stock of Ronson Corporation, at your option, if the cumulative net profit before Federal income taxes of NJHAI for the period January 1, 1966 through December 31, 1967 is $50,000 or more. (1) If the net profit before Federal income taxes of NJHAI for the period January 1, 1967 through December 31, 1967 is $50,000 or more, all notes due and payable to you will be paid on their maturity dates and if any prior note or notes to you have not been paid, said prior notes will be paid on the same date as the second note is due and payable. c. The third note will be due and payable at the end of the fourth year following the date Conhel purchased your stock. This note will be paid in cash, or in common stock of Ronson Corporation, at your option, if the cumulative net profit before Federal income taxes of NJHAI for the period January 1, 1966 through December 31, 1968 is $50,000 or more. (1) If the net profit before Federal income taxes of NJHAI for the period January 1, 1968 through December 31, 1968 is $50,000 or more, all notes due and *233 payable to you will be paid on their maturity dates and if any prior note or notes to you have not been paid, said prior notes will be paid on the same date as the third note is due and payable. d. The fourth note will be due and payable at the end of the fifth year following the date Conhel purchased your stock. This note will be paid in cash, or in common stock of Ronson Corporation, at your option, if the cumulative net profit before Federal income taxes of NJHAI for the period January 1, 1966 through December 31, 1969 is $50,000 or more. (1) If the net profit before Federal income taxes of NJHAI for the period January 1, 1969 through December 31, 1969 is $50,000 or more, all notes due and payable to you will be paid on their maturity dates and if any prior note or notes to you have not been paid, said prior notes will be paid on the same date as the fourth note is due and payable. On September 1, 1965, the transaction whereby Conhel acquired all of the NJHA stock was closed and petitioner received from Conhel four notes, each marked, "5% Note." The four notes were designated by series as (Series A), (Series B), (Series C), and (Series D). Each note was in the amount of $3,750. *234 Each of these notes was dated September 1, 1965. The Series A note provided in part as follows: FOR VALUE RECEIVED, the undersigned, CONHEL CORP., (hereinafter called "Conhel"), a corporation existing under the laws of the State of New Jersey, hereby promises to pay to Henry Grudberg, the principal sum of Three thousand seven hundred and fifty dollars ($3,750.00) on September 1, 1967, or other dates specified in an Offer to Purchase Shares of Common Stock of NJHAI dated June 24, 1965, which Offer is expressly made a part hereof. Payment of principal is contingent upon the terms and conditions of said Offer. Interest (computed on the basis of a 360-day year --30-day month) on the unpaid balance thereof at the rate of 5% per annum from the date hereof, is payable semiannually on the first day of March and September in each year, commencing with March 1 next succeeding the date hereof, until September 1, 1970. In the event that the net profits of New Jersey Helicopter Airways, Inc., do not meet the conditions and requirements specified in the Offer of June 24, 1965, then on September 1, 1970 this instrument shall become null and void and all rights to the principal amount or further *235 interest thereon, or both, shall cease and Conhel shall have no other or further obligations to the holder hereof whatsoever. The Series B, C, and D notes each contained the same provision except that the date of payment of the Series B was September 1, 1968; of the Series C, September 1, 1969; and of the Series D. September 1, 1970. Petitioner, as of August 31, 1965, also owned a $2,000 debenture of NJHA. For this he received an unconditional note from Conhel in the amount of $2,000. At the time the agreement was arrived at between Conhel and petitioner with respect to the purchase of the NJHA stock by Conhel, it was also agreed that petitioner would become employed by Conhel and Conhel and petitioner entered into a contract for his employment. Petitioner remained employed by Conhel until May 1967. At the time petitioner left the employ of Conhel, litigation ensued over his employment contract which was amicably settled later that year. At the time this litigation was settled, petitioner was officially released from any liability on $102,970.44 of the $110,000 note which he had given to Ronson for the loan made to him shortly prior to the acquisition of the NJHA stock by Conhel. *236 Prior to this time petitioner had, in effect, considered that he no longer had an actual liability on $102,970.44 of this note since the company which owed him the $102,970.44 was, after September 1, 1965, owned by a subsidiary of Ronson. Petitioner received no payment on any of his four notes and made no inquiry with respect to payment thereof until September 10, 1970, when he addressed a letter to the president of Ronson which read as follows: I have had several inquiries from the note holders of Conhel Corporation's contingent and non-contingent notes concerning the status of their payment due September 1, 1970. Would you kindly let me know when the payment of the non-contingent notes will be forthcoming and whether the payment of the contingent notes will be made. Under date of September 14, 1970, petitioner received a letter from the vice president and general counsel of Ronson in reply to his letter of September 10, 1970, to the president of that corporation, which insofar as here pertinent read as follows: Regarding your inquiry as to the contingent notes of Conhel, I would like to requote the clause which is in each of these notes concerning the contingencies which *237 had to be met in order for these notes to become due and payable: "In the event that the net profits of New Jersey Helicopter Airways, Inc., do not meet the conditions and requirements specified in the Offer of June 24, 1965, then on September 1, 1970 this instrument shall become null and void and all rights to the principal amount or further interest thereon, or both, shall cease and Conhel shall have no other or further obligations to the holder hereof whatsoever." In view of the fact that these contingencies were not met, these contingent notes are now null and void. However, the Conhel non-contigent notes are now due and payable. With regard to these, notification is being sent to all holders of same regarding presentment and payment. As to your personal account, please be advised that your collateral note, a copy of which is annexed, was also due and payable on September 1, 1970. A statement of your account as of September 1 is as follows: H. B. Grudberg note
$8,029.76
Unpaid interest
1,164.31
Owing from H. B.
Grudberg to Ronson
on Grudberg note
$9,194.07
Amount of Conhel non-
contingent debenture
note issued to H. B.
Grudberg
$2,000.00
Accrued interest on
non-contingent
note
200.00
Accrued interest
on contingent
note
1,500.00
Total
3,700.00
Balance due Ronson
Corporation from
H. B. Grudberg
$5,494.07
*238 Demand is hereby made for the balance due and owing to Ronson Corporation. In 1970 petitioner owned one share of stock in Ronson which he had retained at the time of the settlement of his employment contract when he surrendered any other Ronson stock he had and any options he had to purchase Ronson stock. Because of having one share of Ronson stock he received the report to stockholders of Ronson. Petitioner had received a Ronson stockholder's report which referred to a $100,000 uninsured loss of NJHA, the stock of which was owned by Conhel, when a fire occurred in a helicopter hanger. Petitioner was of the view that NJHA properties were fully insured and believed that the reason profits had not been shown by NJHA so as to warrant payment of the contingency notes was because the $100,000 fire loss had offset profits otherwise made. During the year 1970, after receiving the letter of September 14, 1970, petitioner wrote two letters to Conhel requesting that he be furnished with profit and loss statements of NJHA to verify the statements contained in the letter of September 14, 1970. Petitioner received no answers to these letters. He has never paid the $5,494.07 balance shown to *239 be due by him to Ronson in the letter of September 14, 1970, and has received no demand or request for payment other than the letter of September 14, 1970. After receiving no replies to the two letters he wrote in 1970, petitioner investigated the cost of bringing some form of action to require Conhel to furnish him with profit and loss statements, and because of the estimated cost of such an action never pursued such action. On his Federal income tax return for the calendar year 1970, petitioner claimed as an ordinary loss deduction the amount of $15,000, and attached to that return a statement which outlined the agreement under which his stock was acquired by Conhel to which statement he attached copies of the June 24, 1965, letter agreement which he had with Conhel, a copy of each of his four contingency notes from Conhel, a copy of his letter of September 10, 1970, to the president of Ronson, and a copy of the September 14, 1970, reply he received from the president and general counsel of Ronson. On his 1970 return petitioner also showed an unsued long-term capital loss carryover from 1969 of $1,011.09 which he showed to be deductible to the extent of $1,000 since he showed *240 no capital gains on his 1970 return. Respondent in his notice of deficiency disallowed petitioner's claimed deduction of an ordinary loss of $15,000 with the explanation, "you did not furnish information needed to support the claimed deduction." OPINION Petitioner at the trial did not state the legal basis of his claim for the $15,000 loss, but merely recited the factual basis which was to some extent stated in his tax return and which has been set forth in our findings in some detail from the testimony and documentary evidence received at the trial. Respondent at the trial and on brief takes the primary position that petitioner sold his stock in 1965 in exchange for contingency notes which had no ascertainable fair market value. Respondent argues that since these notes had no ascertainable fair market value, under the holding of , the the sale by petitioner of his stock in 1965 was not a closed transaction, and that the earliest the transaction could be considered as closed was in 1970 when petitioner was notified by Ronson that the contingency notes he had received for his stock were null and void. Respondent points *241 out that petitioner's stock in NJHA was a capital asset. Respondent argues that petitioner's sale of this stock in a transaction which was not closed before 1970 resulted in a capital loss either in that year or a later year. It is respondent's position that since petitioner had already used the maximum allowable capital loss in 1970 in reporting his income, no part of the $15,000 capital loss in 1970 is usable in that year by petitioner to reduce that year's otherwise computed income. In the alternative respondent contends that if it is considered that the four notes which petitioner received for his stock in 1965 had an ascertainable fair market value, then to the extent those notes did not have a fair market value of their face value, petitioner had a capital loss in 1965 in a transaction closed in that year. Respondent argues that if the transaction is considered closed in 1965, whatever amount was assigned as the fair market value of the notes in 1965 would be the amount of petitioner's loss if the notes are considered as being worthless in 1970 and that this loss should be considered, under the holding of , to *242 be a capital loss since it had its origin in a capital transaction. Respondent states that on this record it is not clear whether petitioner had ceased pursuing remedies to collect his notes during the year 1970 so that these notes might be considered worthless in 1970. Respondent argues that if, in fact, it should be concluded that the notes were not worthless in 1970, then petitioner had no loss, either ordinary or capital, in 1970 since the loss would not arise until the notes did become worthless in some later year. Although petitioner was afforded the opportunity of filing a brief and later his time for filing such a brief was extended, he has filed no brief. The Court is therefore not in any way informed as to petitioner's legal position in this case. However, this record is totally devoid of what value, if any, the four notes which petitioner received for his stock in 1965 had. At the trial petitioner offered no evidence as to whether these notes had an ascertainable fair market value when they were received in 1965. In this case, since it is respondent's determination that petitioner had not shown that he was entitled to an ordinary loss deduction in 1970, the burden is on *243 petitioner to show that the notes received in 1965 did have an ascertainable fair market value, and this petitioner has failed to do. Whether a note or other contractual obligation has an ascertainable fair market value is a question of fact to be determined from the evidence in the case with the burden on the taxpayer to show error in respondent's determination. ; (C.A. 7, 1961), affirming a Memorandum Opinion of this Court; and . In (C.A. 5, 1973), affirming , the court stated as follows with respect to the open transaction doctrine: The "open transaction" doctrine is an exception to the usual treatment arising from an exchange of property for a note or other form of property. When a note is received in exchange for *244 property, the fair market value of the note is usually ascertainable and the gain can be computed and taxed at that time, the taxpayer being deemed to have received the market value of the note. . Thereafter, the note is seen as an independent asset with a new cost basis equal to the fair market value previously charged as income to the taxpayer. The original transaction is then deemed closed because the appropriate tax consequences have taken place. However, when the note received in the exchange does not have a readily ascertainable fair market value at the time of its receipt, computation of gain on the exchange is impossible. As a result, the courts have found it necessary to treat the exchange as an "open transaction" until the note is collected. Upon collection the amount received relates back to the initial exchange for tax purposes. ;; . Thus, if the "open transaction" event qualified for capital gain treatment, the amounts ultimately collected do also. The *245 "open transaction" doctrine is a rule of fairness designed to ascertain with reasonable accuracy the amount of gain or loss realized upon an exchange, and, if appropriate, to defer recognition thereof until the correct amounts can be accurately determined. In this case, aside from petitioner's total lack of carrying his burden of proof that the four notes he received in 1965 had an ascertainable fair market value, the evidence which is in the record indicates that they did not. The evidence shows that payment of these notes was totally dependent on substantial profits being made within a 5-year period by a company that was in financial straits when the stock was sold for the contingency notes. In fact, it was the financial straits of the company that led to the entire arrangement of the stock sale. As of the date of the sale of the stock, it would be very difficult to ascertain the prospects of NJHA in the hands of new management and owned by a stockholder possibly able to sufficiently finance its operation. In our view, the facts that are in this record show as did the facts in Stephen H. Dorsey [] that the right to receive payments on notes "depended *246 upon numerous uncertainties of such a character as to make any estimate of the fair market value * * * [on the date the notes were executed] sheer surmise and speculation." We therefore conclude that when the notes were issued for petitioner's stock in 1965, the transaction was an "open" transaction and no determination should be made of gain or loss until payment had been received on the notes equal to petitioner's basis in the stock or the notes or any unpaid balance on the notes became worthless. The more difficult factual question here is whether in fact petitioner's notes became worthless in 1970 so that he sustained a capital loss in that year. However, for the purposes of this case we need not decide this question since petitioner could in no way reduce his taxable income by any portion of the $15,000 capital loss from the sale of his stock if in fact such a loss was sustained in 1970. We are not here concerned with any carryover or carryback of capital losses since the only year before us is 1970. Therefore, having concluded that petitioner did not sustain an ordinary loss in 1970 since any loss which he might have had in that year from nonpayment of the four notes would *247 be a capital loss from the sale of his NJHA stock, we sustain respondent's determination that petitioner is not entitled to deduct the $15,000 claimed ordinary loss in the year 1970. Decision will be entered for respondent.
Footnotes
1. The testimony that the remainder was $8,029.76 is obviously an error, as $102,974.44 subtracted from $110,000 would result in a remainder of $7,029.56.↩